**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Darren S. BRADLEY, Defendant–
Appellant.**

**No. 97–3465.**

United States Court of Appeals,
Seventh Circuit.

Argued March 4, 1998.

Decided May 13, 1998.

Suzanne M. Wissman (argued), Office of the U.S. Atty., Fairview Heights, IL, for Plaintiff–Appellee.

Melissa A. Day (argued), Office of the Federal Public Defender, Benton, IL, for Defendant–Appellant.

Before CUMMINGS, ESCHBACH, and MANION, Circuit Judges.

MANION, Circuit Judge.

Scott Bradley appeals from his conviction as a felon in possession of a firearm and ammunition. *See* 18 U.S.C. § 922(g)(1). He contends that the trial court abused its discretion under Rule 403 of the Federal Rules of Evidence by admitting into evidence a tape recording of a 911 emergency call that he claims was "cumulative, confusing, of little probative value and highly prejudicial." Bradley also argues that the trial court's admission of a written statement taken by police from his wife, who declined to testify against Bradley, was both an abuse of discretion under the rules of evidence and a violation of his Sixth Amendment right to confront adverse witnesses. We affirm.

## I. Factual Background

During the mid-morning hours of July 20, 1996, police emergency services received the following 911 telephone call from an unknown woman subsequently identified as Terri Bradley, the defendant's wife:

Caller: Would you send a car to 308 Bell?

Dispatcher: 308 Bell?

Caller: Yeah, please hurry.

Dispatcher: What's the problem?

Caller: He pulled a gun on me.

Dispatcher: OK, you stay on the phone, OK?

Caller: I can't, here he comes.

Dispatcher: You stay on the phone.

Caller: I can't, here he comes. (Dial Tone)

The police dispatcher, who gave the incident the highest priority, broadcast notification to police officers city-wide. Three officers responded within minutes.

Scott Bradley was standing at the front door inside the dwelling at 308 Bell as police arrived. He stepped out of the house as two of the officers approached. One of them handcuffed Bradley and then conducted a pat-down for weapons; he discovered .38–caliber bullets in the pocket of Bradley's pants. While police quizzed Bradley about whether he had a gun—he denied having one—another officer entered the residence to interview Ms. Bradley. The officer's incident report relates that Ms. Bradley was visibly upset and crying. She informed the officer that she had gotten into an argument with her husband, who had been out all night and had taken their young niece and nephew with him. During the course of the argument, she recalled, Bradley left the room and then returned, at which point he displayed a firearm she described as "a small black revolver." Bradley challenged her to do something about his all-night wanderings.

After a search of the exterior of the home failed to turn up a weapon, an officer asked Ms. Bradley if he could search the master bedroom. She consented. During the course of the search, the officer lifted up a mattress and discovered a small, black, unloaded .38–caliber revolver, suitable for firing the bullets discovered in Bradley's pocket. When the officer asked Ms. Bradley if the weapon was similar to the one her husband had displayed earlier, she replied yes. He then asked her to provide a formal statement about the incident at police headquarters.

Ms. Bradley was interviewed by Detective Marty Terry for approximately forty-five minutes. The redacted version of Ms. Bradley's statement that was read at trial informed the jury that she and her husband had gotten into an argument, during the course of which Bradley had left the room. He then called to his wife to come to the bedroom, whereupon he "pulled ... a black pistol" on her. She walked away, and Bradley went outside of the house briefly, at which point Ms. Bradley placed the 911 call.

Prior to trial, Ms. Bradley invoked her marital privilege not to testify against her husband. The defendant filed a motion *in limine* to bar any in-court reference to his wife's 911 call, her oral statements to the responding officers, and the written statement taken by Detective Terry at the station. After considering the government's response and hearing argument, the court denied the motion. Bradley renewed his objections during the course of the proceedings.

At trial, the government presented an array of evidence, including the tape recording of Ms. Bradley's 911 call, admitted both as an excited utterance and as evidence of Ms. Bradley's present sense impressions. Because Ms. Bradley was technically "unavailable," Detective Terry read her written statement into evidence and testified regarding the circumstances surrounding his interview with her. Detective Terry disclosed that it was he who had prepared the written statement, which Ms. Bradley signed after he read it back to her. He further testified that she appeared to be somewhat upset upon her arrival at police headquarters, but as she recounted her story she became "very upset" and began to cry. On cross-examination, Detective Terry conceded that Ms. Bradley had not been placed under oath during the interview.

A forensic scientist also testified for the government, informing the jury that he had been unable to obtain fingerprints from the gun and ammunition recovered during the arrest. Both the gun and the bullets were in poor condition, partially rusted and pitted, making it difficult to obtain an identifiable fingerprint. Moreover, the abrasion of Bradley's pants pocket material against the bullets, like the abrasion of the bed sheets and the mattress against the pistol, had further degraded whatever latent prints may have been left on the objects' surfaces.

After deliberation, the jury found Bradley guilty of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). Because of Bradley's prior felony record, he was sentenced to 293 months in prison as an armed career criminal.

Bradley raises three arguments on appeal: (a) the district court abused its discretion in admitting any reference to his wife's 911 emergency call; (b) the statement taken by Detective Terry was erroneously admitted by the court under the "catchall" exception to the hearsay rules; and (c) the district court's admission of the statement violated his constitutional rights under the Confrontation Clause of the Sixth Amendment.

## II. Standard of Review

The trial court's evidentiary decisions, including its rulings on motions *in limine*, are reviewed for abuse of discretion. *See United States v. Singleton*, 125 F.3d 1097, 1106 (7th Cir.1997); *United States v. Guyton*, 36 F.3d 655, 659–60 (7th Cir.1994). The court has abused its discretion in admitting evidence "only when no reasonable person could agree" with its rulings. *United States v. Sinclair*, 74 F.3d 753, 756–57 (7th Cir.1996). The court's admission of evidence under Rule 403 of the Federal Rules of Evidence is entitled to special deference. "Only in an extreme case are appellate judges competent to second-guess the judgment of the person on the spot, the trial judge." *United States v. Crockett*, 979 F.2d 1204, 1211 (7th Cir.1992) (internal quotation and citation omitted).

## III. Discussion

### A. Admission of the 911 Call

The district court admitted into evidence an audio tape of the 911 emergency call received by police on the morning of July 20, 1996. Bradley does not suggest that the 911 tape is not admissible either as a present sense impression or as an excited utterance. *See* Fed.R.Evid. 803(1)(2); *United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir.1995) (911 call admitted as "present sense impression"), *vacated on other grounds*, 516 U.S. 1168, 116 S.Ct. 1257, 134 L.Ed.2d 206 (1996); *Bemis v. Edwards*, 45 F.3d 1369, 1372–74 (9th Cir.1995) (911 call evaluated as but determined not to be a "present sense impression" or "excited utterance" because declarant did not witness what he reported); *cf. United States v. Cutchin*, 956 F.2d 1216, 1218 (D.C.Cir.1992) (911 call admissible to address

the legality of subsequent police conduct). He argues instead that the tape provided "no evidence" relevant to his conviction as a felon in possession of a firearm and ammunition. He further contends that admission of the tape was unfairly prejudicial, confusing to the jury and cumulative.

To keep this in focus, we note that Bradley was charged with two counts of violating 18 U.S.C. § 922(g)(1): the first count alleged his knowing possession of a firearm, and the second, his knowing possession of ammunition. The jury, which found Bradley guilty on both counts, was therefore obligated to find: 1) he had a prior felony conviction; 2) he knowingly possessed the firearm and the ammunition described in the indictment; and 3) the firearm and ammunition he knowingly possessed had traveled in or affected interstate commerce. *See id.; United States v. Johnson,* 127 F.3d 625, 629 (7th Cir.1997). The first and third elements were easily established, since Bradley's felony record was the subject of a stipulation read by the court to the jury, and the government's expert witness testified without objection that the .38–caliber pistol recovered from the master bedroom, like the ammunition discovered in Bradley's pants pocket, were manufactured "outside the state of Illinois." *See United States v. Lewis,* 100 F.3d 49, 53 (7th Cir. 1996). Only the second element, Bradley's knowing possession of the gun and the ammunition, is thus at issue.

With this in mind, it is clearly unavailing for Bradley to contend that the 911 call is irrelevant because "there was no challenge as to the 911 call itself." "Relevant evidence" is defined as that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. In this case, the 911 call establishes or tends to establish the following: a woman was the victim, a lone man was the aggressor, the incident took place at a particular address, and the gunman was not in the victim's immediate presence when she placed the 911 call. The 911 call also explains the urgency and magnitude of the police response which, in turn, resulted in the discov-

ery of highly probative evidence, that is, the bullets found on Bradley's person and an unloaded gun suitable for firing those bullets found in the master bedroom. The immediacy of the police response to the emergency call likewise makes it more likely that the only two adults found at 308 Bell—the defendant and his wife—were the "he" and "I" referenced by the 911 caller. Furthermore, the emergency call provides background for the very thorough search of Bradley's bedroom which might otherwise go unexplained. *See United States v. Vretta,* 790 F.2d 651, 655–56 (7th Cir.1986). All of these facts make it more probable that Ms. Bradley was the unidentified 911 caller, that Bradley was the unidentified gunman referred to in the call, and that he knowingly possessed a firearm and ammunition. *See United States v. Kitchen,* 57 F.3d 516, 520–21 (7th Cir.1995) (discussing actual and constructive possession).

█ Bradley's further argument that admission of the 911 call was unfairly prejudicial, confusing and cumulative is similarly without substance. Relevant evidence is inherently prejudicial; only where the unfair prejudice created by its admission substantially outweighs its probative value should the trial court, in the exercise of its discretion, exclude the evidence. *See* Fed.R.Evid. 403; *United States v. Pulido,* 69 F.3d 192, 201 (7th Cir.1995). To the extent that the defendant perceives Rule 403 as a tool designed "to permit the court to 'even out' the weight of the evidence, to mitigate a crime, or to make a contest where there is little or none," he is mistaken. *United States v. McRae,* 593 F.2d 700, 707 (5th Cir.1979). Moreover, the defendant has made no effort to explain how he was unfairly prejudiced by admission of the 911 call. *See* Fed.R.Evid. 403, advisory committee notes; *Guyton,* 36 F.3d at 660. Neither does Bradley suggest how the jury was confused—distracted or led astray through consideration of "collateral issues"—because of the tape's introduction. *Spain v. Gallegos,* 26 F.3d 439, 453 (3d Cir. 1994) (internal quotation and citation omitted). To the contrary, nothing in the record suggests that the jury's decision rested on anything other than evidence of Bradley's unlawful possession of a firearm and ammu-

nition. Finally, there is no basis for concluding that the tape of the 911 call was simply cumulative, the tape's evidentiary value outweighed by its "contribution to the length of the trial." *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir.1996). As discussed above, the tape provided relevant, probative evidence of the defendant's knowing possession of a firearm and ammunition.

The defendant's unsupported claims of prejudice and confusion, without more, are insufficient to exclude evidence under Rule 403. Based on the record before this court, the tape of the 911 call was properly admitted.

### B. Admission of the Written Statement

The district court admitted Ms. Bradley's statement to Detective Terry under the residual exception to the rules of hearsay. *See* Fed.R.Evid. 804(b)(5). The defendant argues that the statement fails to meet the "stringent standards" of admissibility under Rule 804(b)(5). *United States v. Snyder*, 872 F.2d 1351, 1354–55 (7th Cir.1989). He further contends that the statement fails to satisfy the related but distinct standards imposed under the Confrontation Clause. *See* U.S. Const. amend. VI; *Idaho v. Wright*, 497 U.S. 805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *United States v. Dent*, 984 F.2d 1453, 1462 (7th Cir.1993). Bradley reasons that the written statement lacks the necessary trustworthiness or "indicia of reliability," *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), to warrant its admission.

#### 1. Rule 804(b)(5) hearsay exception.

■■ Rule 804(b)(5), the "catch-all" or residual exception to the rule against hearsay, provides in relevant part, "The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness: ... A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthi-

ness." Fed.R.Evid. 804(b)(5). The proponent must therefore demonstrate that the statement is as trustworthy as evidence admissible under the specific exceptions articulated in the remainder of Rule 804. *See Singleton*, 125 F.3d at 1106; *Snyder*, 872 F.2d at 1354–55. In addition, the declaration must be "offered as evidence of a material fact," be more probative of that point than any other evidence the proponent can procure through reasonable efforts, and serve both "the general purposes" of the Rules of Evidence and "the interests of justice." Fed. R.Evid. 804(b)(5)(A)–(C); *see also* Fed. R.Evid. 102; *United States v. Ismoila*, 100 F.3d 380, 393 (5th Cir.1996); *Dent*, 984 F.2d at 1462.[1]

■■ Bradley emphasizes that his wife's statement was not taken under oath; that her statement was written out by Detective Terry, who merely read the statement to her for her approval before she signed; and that her testimonial statement was not subject to cross-examination. Although these concerns are not insubstantial, *see United States v. Accetturo*, 966 F.2d 631, 635 (11th Cir.1992), the lack of accompanying oath or cross-examination is not dispositive of the unreliability, and thus the inadmissibility, of Ms. Bradley's declaration, *see, e.g., Singleton*, 125 F.3d at 1106; *United States v. Lang*, 904 F.2d 618, 623 & n. 9 (11th Cir.1990); *Snyder*, 872 F.2d at 1356. Indeed, many additional factors have proven helpful to the courts in determining whether the proffered evidence exhibits the necessary "circumstantial guarantees of trustworthiness": the declarant's character for truthfulness or honesty; the voluntariness or spontaneity of the declaration; the relationship of the declarant to the defendant and to the government; the existence of corroborating evidence; the extent to which the declaration reflects the declarant's personal knowledge; the immediacy of the declaration to the event described; whether the declarant ever recanted her story; consisten-

---

1. It is undisputed that Ms. Bradley's decision to invoke her privilege not to testify against her husband renders her an unavailable declarant for purposes of Rule 804. *See* Fed.R.Evid. 804(a)(1); *Trammel v. United States*, 445 U.S. 40, 53, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). The defendant likewise does not suggest that he failed to receive adequate prior notice that the government intended to use the statement and, thus, that he was unprepared to meet it. *See* Fed.R.Evid. 804(b)(5); *United States v. Doe*, 860 F.2d 488, 491–92 (1st Cir.1988).

cy in the recitation of the statement over time; and the reasons for the declarant's unavailability. *See, e.g., Singleton,* 125 F.3d at 1106. This list is neither exhaustive nor should it be applied mechanically. As the courts have consistently explained, each case must be analyzed on its own facts. *See United States v. Mokol,* 939 F.2d 436, 439 (7th Cir.1991).

■ In this instance, Detective Terry testified regarding his habitual practice for obtaining witness statements:

They will tell their story [sic] of what happened. I will make notes, and then after they're finished, then I will write the actual statement asking questions again as I go to make sure that I'm clear on what they have said and that what the statement actually says is what they want to say [sic].

Detective Terry testified that he followed that procedure here. He wrote down Ms. Bradley's statement, then "read the statement to her after [he] had written it, and she signed it then as agreeing that that's what she said." Ms. Bradley could, therefore, hardly have been unaware that Detective Terry was making notes during her interview and thus that what she was saying "would be the subject of further investigation—and confirmation—by the government." *United States v. Ellis,* 951 F.2d 580, 583 (4th Cir. 1991) (Powell, J., sitting by designation). Neither does the fact that a statement is elicited under questioning necessarily bar its admission under the residual hearsay exception. *See Doe v. United States,* 976 F.2d 1071, 1079–81 (7th Cir.1992).

Bradley concedes that his wife never recanted her statement to Detective Terry, but claims that "she never affirmed it in any matter." Her signature, however, appears at the bottom of each page of her statement, an affirmative act of adoption or approval. Each page also contains the following preprinted advisory: "[I] make the following statement of my own free will and accord, without threats or promises of reward, immunity, coercion or intimidation. I have been advised this statement can be used in court and I hereby make this statement freely and voluntarily." Detective Terry testified that he read the advisory to Ms. Bradley at the time she made her statement, further suggesting that Ms. Bradley understood she could be held accountable for the truth of her declaration. *See United States v. Allen,* 798 F.2d 985, 994 (7th Cir.1986).

The time noted on the statement indicates that Ms. Bradley completed her interview within two hours of having made the 911 emergency call. The episode was therefore fresh in her mind. Ms. Bradley also appeared distraught, both when the police arrived at her residence and as she related her story to Detective Terry. This is consistent with the trauma she described. Furthermore, important elements of Ms. Bradley's statement are in accord with her prior declarations to police. The unidentified female who placed the 911 call declared, "He pulled a gun on me," and "here he comes," evidence that the lone gunman was not in her immediate presence when the emergency call was made. Ms. Bradley later identified herself to responding officers and Detective Terry as the 911 caller, and confirmed that Bradley was not with her when she placed the call. Moreover, she consistently described the gun as a small, black pistol. The core of her statement is thus consistent with and corroborated by her prior declarations.

In addition, the statement to Detective Terry satisfies the remaining elements of Rule 804(b)(5). Ms. Bradley's statement is "evidence of a material fact," Fed.R.Evid. 804(b)(5)(A), since it represents direct evidence of the defendant's knowing possession of a firearm, *see* 18 U.S.C. § 922(g)(1); *Kitchen,* 57 F.3d at 520. Her statement is also "more probative on the point for which it is offered than any other evidence" that the government could obtain through "reasonable efforts." Fed.R.Evid. 804(b)(5)(B). Testimony by the responding officers established Bradley's "hands-on physical possession" of ammunition, in itself a sufficient basis on which to rest Bradley's conviction. *See* 18 U.S.C. § 922(g)(1); *United States v. Talbott,* 78 F.3d 1183, 1185, 1187–88 (7th Cir.1996) (per curiam). Ms. Bradley's statement, however, is the only direct evidence of the defendant's actual possession of the firearm described in Count 1 of the indictment.

Finally, the introduction of Ms. Bradley's statement into evidence serves "the general purposes" of the Rules of Evidence and "the interests of justice." Fed.R.Evid. 804(b)(5)(C). The statement helps to assure the integrity of the fact-finding process and secure the public's interest in the disclosure of reliable, probative evidence while preserving the defendant's constitutional right to confront his accusers and test adverse evidence. *See* Fed.R.Evid. 102; *Lee v. Illinois,* 476 U.S. 530, 539–43, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). The defendant elicited testimony from Detective Terry that Ms. Bradley was not under oath during the interview, and argued at closing that her statement was not subject to cross-examination. As noted above, however, neither factor is dispositive of the unreliability and thus, the inadmissibility of Ms. Bradley's statement under Rule 804(b)(5).

It cannot be said that Ms. Bradley's statement lacked adequate circumstantial guarantees of trustworthiness or otherwise failed to satisfy the requirements of Rule 804. Thus, the district court did not abuse its discretion in admitting Ms. Bradley's statement as a residual exception to the hearsay rules.

### 2. *Rule 804(b)(5) and the Confrontation Clause.*

██ Bradley contends that even if his wife's statement was properly admitted under Rule 804(b)(5), its use violated his Sixth Amendment right to confront adverse witnesses. He points to alleged inconsistencies in the responding officers' statements at trial, suggesting both in his brief and at argument that their "conflicting and confusing testimony" calls into question the reliability of his wife's statement to Detective Terry.

██ Under the Confrontation Clause, evidence not falling within a "firmly rooted hearsay exception" is "presumptively unreliable." *Lee,* 476 U.S. at 543–44, 106 S.Ct. 2056. Because the "catch-all" exception is, by its terms, not as "firmly rooted" as other exceptions to the rule against hearsay, evidence submitted under Rule 804(b)(5) is inadmissible absent "a showing of particularized guarantees of trustworthiness." *Wright,* 497 U.S. at 814–17, 110 S.Ct. 3139. The unifying prin-

ciple is whether the declarant was "particularly likely to be telling the truth when the statement was made." *Id.* at 821–22, 110 S.Ct. 3139. "It must be clear that [Ms. Bradley] made the statements, and the statements must be inherently reliable because of the circumstances surrounding them." *United States v. Harty,* 930 F.2d 1257, 1264–65 (7th Cir.1991).

Viewed in this light, Bradley's contention about the in-court testimony of the responding officers concerns their credibility, not the reliability of Ms. Bradley's out-of-court statement to Detective Terry. *See United States v. Barone,* 114 F.3d 1284, 1300–01 (1st Cir. 1997). His claim is little more than an invitation to reweigh the credibility of the witnesses, an argument, absent extraordinary circumstances, not properly addressed to this court. *See United States v. Earnest,* 129 F.3d 906, 912–13 (7th Cir.1997). As the Supreme Court has explained, the reliability of the challenged declaration must instead be determined through an examination of the totality of the circumstances that surround the making of the statement. *See, e.g., Wright,* 497 U.S. at 819–21, 110 S.Ct. 3139; *Ismoila,* 100 F.3d at 393.

After examining the totality of the circumstances surrounding the making of Ms. Bradley's statement to Detective Terry, we agree with the district court that Ms. Bradley was "particularly likely to be telling the truth when the statement was made." *Wright,* 497 U.S. at 822, 110 S.Ct. 3139. First, there can be no serious dispute that Ms. Bradley's statement was based on personal knowledge and recent experience. Her statement, while not in her own handwriting, was given voluntarily; there has been no suggestion that she was offered any incentive by law enforcement officials to secure the statement against her husband. *Cf. Government of Virgin Islands v. Joseph,* 964 F.2d 1380, 1388 (3d Cir.1992) (a victim is likely to have "strong motivation" to bring her assailant to justice "in order to prevent another assault"). As noted above, Ms. Bradley must surely have realized that her statement would be subject to investigation and confirmation by police, a disincentive to fabricate a story that could be proven untrue. *See Accetturo,* 966 F.2d at

635; *Ellis*, 951 F.2d at 583. The pre-printed advisory that appears on her statement likewise suggests that Ms. Bradley was aware "she could [be] held accountable for her accusations if they proved false." *United States v. Chapman*, 866 F.2d 1326, 1331 (11th Cir. 1989). Moreover, based on Detective Terry's interviewing procedure, the incidents described in the written statement must have been fully recounted at least twice, if not three times, during her interview: once when Ms. Bradley initially told her story and Detective Terry made notes; once when he actually wrote out her statement, asking clarifying questions "to make sure" that he clearly understood her and that he accurately recorded her statement; and once when he reread her statement to her. In this regard, Detective Terry's questioning of Ms. Bradley apparently did not begin until after she had first recounted her story and he had taken notes, that is, after she had committed herself to a particular set of assertions, thereby minimizing the effect of police questioning on the possible evolution of her story. *See Doe*, 976 F.2d at 1075, 1079–80. Ms. Bradley then signed the statement, an affirmative act of approval or adoption. While she invoked her privilege not to testify, she never recanted or otherwise disavowed the accuracy of her declaration. *See United States v. Schoenborn*, 4 F.3d 1424, 1427–29 (7th Cir.1993).

Based on the totality of the circumstances surrounding her declaration to Detective Terry, it cannot be said that Ms. Bradley's statement lacked sufficient indicia of reliability to warrant its exclusion at trial. Neither were the defendant's rights under the Confrontation Clause violated by the admission and use of his wife's statement.

The decision of the district court is therefore AFFIRMED.